**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| RSL SENIOR PARTNERS LLC,<br>derivatively and on behalf of LIBERTY<br>TAX, INC.,<br><br>      Plaintiff,<br><br>      v.<br><br>EDWARD L. BRUNOT, JOHN T.<br>HEWITT, KATHLEEN E. DONOVAN,<br>GORDON D'ANGELO, JOHN<br>GAREL, THOMAS HERSKOVITS,<br>ROBERT M. HOWARD, ROSS N.<br>LONGFIELD, STEVEN IBBOTSON,<br>ELLEN M. MCDOWELL, NICOLE<br>OSSENFORT, GEORGE ROBSON,<br>and JOHN SEAL,<br><br>      Defendants,<br><br>      and<br><br>LIBERTY TAX, INC.,<br><br>      Nominal Defendant. | Case No.    2:18cv127<br><br>JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff RSL Senior Partners LLC ("Plaintiff"), by its undersigned attorneys, derivatively and on behalf of Nominal Defendant Liberty Tax, Inc. ("Liberty" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Edward L. Brunot, John T. Hewitt, Kathleen E. Donovan, Gordon D'Angelo, John Garel, Thomas Herskovits, Robert M. Howard, Ross N. Longfield, Steven Ibbotson, Ellen M. McDowell, Nicole Ossenfort,

George Robson, and John Seal (collectively, the "Individual Defendants," and together with Liberty, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Liberty, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, and violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for its complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Liberty, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Liberty's directors and officers.

2.      Liberty Tax Inc. was founded by Defendant John T. Hewitt ("Hewitt") after he was ousted from Jackson Hewitt, another tax preparation firm.

3.      Liberty is a tax service provider which operates on a franchise model.

4.      Liberty has a corporate structure under which the holders of Class B shares are entitled to elect a majority of the Board of Directors. Defendant Hewitt holds all 200,000

- 2 -

outstanding Class B shares, providing him control over a majority of the board, and, in effect, of Liberty.

5.     From June 29, 2016 through the present day (the "Relevant Period"), Defendant Hewitt undertook efforts to entrench his position at Liberty while engaging in sexual misconduct with Company employees and using Company funds for personal gain. This conduct created an inappropriate "tone at the top," loss of key executive officers, directors, and employees, loss of the Company's independent auditor, and resulted in the Company making materially false and misleading statements to the investing public, all of which subjected the Company to investigation and securities class action litigation.

6.     The Company's ethics hotline received a complaint on July 12, 2017, which alleged that one or more employees had heard Hewitt engaging in sexual activity in his office. In response, the Audit Committee of the Board of Directors of Liberty engaged Skadden, Arps, Slate, Meager, & Flom LLP ("Skadden") to investigate.

7.     The Skadden investigation revealed that Defendant Hewitt had: (1) romantic relationships with at least one employee, and possibly with ten others; (2) permitted an employee he was allegedly seeing romantically to purchase a Liberty franchise with no money down, and then bought back the franchise after the relationship ended at a higher price than it had been sold for, in contravention of usual Company policy; (3) hired relatives of female employees he had been seeing romantically; and (4) facilitated the provision of a business loan to a franchisee who had been initially rejected for the loan, following email messages from the franchisee to Defendant Hewitt stating "I love you" and "I miss you" (collectively, the "Sexual Misconduct").

8.      Defendant Hewitt also misused company resources by: (1) scheduling out-of-town meetings to facilitate his attendance at Yankees games; (2) making charges on a Company credit card at a New York racetrack; and (3) directing Company business to a restaurant that he had an ownership interest in (collectively, the "Resource Misconduct").

9.      Following the ethics complaint, a Special Committee of the Board was convened in late July 2017 "to negotiate with Mr. Hewitt for [the] purchase of his class B control shares, and his full separation from any Board or managerial activities."

10.     Following an unsuccessful attempt to negotiate for Defendant Hewitt's departure, the Board terminated Defendant Hewitt as Chief Executive Officer ("CEO") on September 5, 2017. The Company reported in a September 6, 2017 press release that "the Board has determined that it is in the Company's best interests to terminate Mr. Hewitt at this time." The press release reported that "[t]he Company had engaged in a deliberate succession planning process, which resulted in Ed Brunot joining the Company as Chief Operating Officer as an interim step before assuming the role of CEO."

11.     Through his Class B share ownership, Defendant Hewitt, however, has continued to exercise control over the Company. This has led to several high-profile departures, including three of the four Class A directors.

12.     On November 7, 2017, Liberty filed a Form 8-K with the SEC announcing that Defendant Donovan had resigned from her position as CFO.

13.     In response, Liberty shares dropped nearly 17%, or $2.25 per share, to close at $11 per share on November 8, 2017.

14.     Liberty filed a Form 8-K with the SEC on December 11, 2017, announcing the abrupt resignation of KPMG as the Company's independent registered accounting firm. The Form 8-K further disclosed that the filing of the Form 10-Q for the quarter ended October 31, 2017 would be delayed.

15.     On this news, the price of Liberty shares fell more than 6%, or $0.80 per share, from their previous closing price, closing at $11.15 per share on December 11, 2017.

16.     Defendant Hewitt breached his fiduciary duties to the Company by engaging in the Sexual and Resource Misconduct. The Individual Defendants other than Defendant Hewitt breached their fiduciary duties by permitting Defendant Hewitt to engage in the Sexual and Resource Misconduct and by causing the resignation of the Company's independent auditor by failing to heed the promise to KPMG that Defendant Hewitt "would not reinsert himself into the management of" Liberty.

17.     The Individual Defendants also breached their fiduciary duties by approving the severance payment to Defendant Hewitt consisting of $801,005 in a lump-sum payment, 18 months of health benefits and $471,210 in unvested stock awards that had been accelerated.

18.     The Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain internal controls.

19.     Moreover, the Individual Defendants breached their fiduciary duties in that they made and/or caused the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, prospects, and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to

disclose that: (1) Defendant Hewitt, as Liberty's CEO, created an inappropriate "tone at the top"; (2) Defendant Hewitt engaged in the Sexual Misconduct; and (3) Defendant Hewitt engaged in the Resource Misconduct.

20.     As a result of the foregoing, the Individual Defendants' and Company's public statements were materially false and misleading at all relevant times. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

21.     Furthermore, during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while three of them engaged in lucrative insider sales, netting proceeds of about $2 million. Over 33,150 shares of the Company's common stock were repurchased between September 2016 and January 2017 for approximately $417,190. As the Company stock was actually only worth $7.80 per share during that time, the Company overpaid approximately $158,598 in total.

22.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected Liberty, its CEO, its Chief Financial Officer ("CFO"), and its former CEO,[1] to two federal securities fraud class action lawsuits pending in the United States District Court for the Eastern District of New York (the "Securities Class Actions"); the need to undertake internal investigations; losses due to the Company's overpayment of approximately $158,598 for the

---

[1] Specifically, the Securities Class Actions name as defendants Edward L. Brunot, John T. Hewitt and Kathleen E. Donovan, in addition to Liberty.

repurchases of its own stock and the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company; the loss of key executive officers, directors, and the Company's independent auditor; the loss of Company assets to fund Defendant Hewitt's Sexual and Resource Misconduct, and will cost the Company going forward many millions of dollars.

23.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

24.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the substantial likelihood of the directors' liability in this derivative action and of one of them in the related Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Liberty Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

26.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

27.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

28.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

29.     Venue is proper in this District because Liberty's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

30.     Plaintiff is a current shareholder of Liberty common stock. Plaintiff has continuously held Liberty common stock at all relevant times.  Plaintiff is a citizen of New York.

### Nominal Defendant Liberty

31.     Previously known as JTH Holding, Inc., Nominal Defendant Liberty is a Delaware corporation with its principal executive offices at 1716 Corporate Landing Parkway, Virginia Beach, VA 23454 Liberty stock trades on the NASDAQ under the ticker symbol "TAX."

### Defendant Hewitt

32.     Defendant John T. Hewitt ("Hewitt") served as the Company's President and CEO from 1996 until his termination on September 5, 2017. He remains Chairman of the Board of directors, where he has sat since 1996. According to the Company's Schedule 14A filed with the SEC on August 14, 2017 (the "2017 Proxy Statement"), on July 21, 2017, Defendant Hewitt

beneficially owned 2,251,168 shares of the Company's common stock, which represented 15.9% of the Company's outstanding stock on that date.[2] Given that the price per share of the Company's Class A common stock at the close of trading on July 21, 2017 was $14.10, Hewitt owned over $31.7 million worth of Liberty stock.

33.    Defendant Hewitt is the sole holder of the Company's Class B common stock.  He holds 200,000 shares of Class B common stock.  By dint of his ownership of all of the Class B common stock, he is entitled to elect the minimum number of directors necessary to constitute a majority of the entire Board of the Company.

34.    For the fiscal year ended April 30, 2017, Defendant Hewitt received $1,690,075 in compensation from the Company. This included $524,350 in salary, $287,494 in stock awards, $862,500 in option awards, and $15,731 in all other compensation.

35.    The Company's 2017 Proxy Statement stated the following about Defendant Hewitt:

> *John T. Hewitt.*[3] Mr. Hewitt has served as our Chairman, Chief Executive Officer and President since October 1996. Mr. Hewitt is a pioneer in the tax preparation industry with a career in the industry spanning over 40 years. From August 1982 until June 1996, Mr. Hewitt was the Founder, President, Chief Executive Officer and Chairman of Jackson Hewitt Inc., in Virginia Beach, Virginia. From December 1969 until June 1981, Mr. Hewitt held the varying positions of Tax Preparer, Assistant District Manager, District Manager, and Regional Director with H&R Block in Buffalo and Elmira, New York and Moorestown, New Jersey. Mr. Hewitt is the brother of Ellen M. McDowell, one of our directors. In serving as Chairman of the Board of Directors as well as Chief Executive Officer, Mr. Hewitt is effectively able to integrate the operating and business strategies of the company, which is an invaluable asset to the Board in formulating our overall strategic direction.

---

[2] This figure includes (i) 1,751,168 shares of Class A common stock owned by Mr. Hewitt (150,852 of which are held in the Company's 401(k) plan); (ii) 300,000 shares of Class A common stock issuable pursuant to stock options exercisable within 60 days of July 21, 2017; and (iii) 200,000 shares of Class A common stock issuable upon conversion of Class B common stock.

[3] Emphasis in original unless otherwise noted throughout.

36.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Hewitt made the following sales of Company stock (and made no purchases of Company stock). On September 14, 2016, Defendant Hewitt sold 20,000 shares of Company stock for $12.73 per share. On September 30, 2016, Defendant Hewitt sold 10,166 shares of Company stock for $12.80 per share. On June 19, 2017, Defendant Hewitt sold 20,233 shares of Company stock for $12.60 per share. On June 20, 2017, Defendant Hewitt sold 19,767 shares of Company Stock for $12.02 per share. On September 12, 2015, Defendant Hewitt sold 22,458 shares of Company Stock for $41.69 per share. Thus, in total, before the fraud was exposed, he sold over 80,000 Company shares on inside information, for which he received almost $2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

37.     Defendant Hewitt is a citizen of Virginia.

**Defendant Brunot**

38.     Defendant Edward L. Brunot, ("Brunot") is the Company's CEO, a role he has served in from September 8, 2017 to February 19, 2018. From June 1, 2017 to September 8, 2017, Defendant Brunot served as the Company's Chief Operating Officer ("COO"). According to a Form 4 filed with the SEC on June 1, 2017, Defendant Brunot beneficially owned 210,515 shares of the Company's common stock as of that date.[4] Given that the price per share of the

---

[4] Includes (i) 188,088 shares of Class A common stock issuable pursuant to stock options exercisable on December 14, 2018; and (ii) 22,727 restricted stock units which vest in full on December 14, 2018, each of which vest at a rate of 1/3 per year starting on June 1, 2018.

Company's common stock at the close of trading on June 1, 2017 was $14.30, Brunot owned over $3 million worth of Liberty stock.

39.     According to the Form 8-K filed with the SEC on September 8, 2017, Defendant Brunot received a base salary of $600,000 per year as CEO, in addition to an annual bonus with a target maximum of 100% of that salary.

40.     The Company filed a Form 8-K on September 8, 2017 which stated the following about Defendant Brunot:

> Mr. Brunot has served as Chief Operating Officer of the Company since June 1, 2017. Previously, he served as the Executive Vice President and President of MDV at SpartanNash Company, a publicly-traded food distributor and grocery retailer. Prior to the merger between Spartan Stores and Nash Finch in 2013, he served with Nash Finch as Executive Vice President and President and Chief Operating Officer of MDV from 2012 to 2013 and as Senior Vice President and President and Chief Operating Officer of MDV from February 2009 to March 2012. Mr. Brunot joined Nash Finch in July 2006 as Senior Vice President, Military. Mr. Brunot previously served as Senior Vice President and Vice President of Operations of two privately held temperature controlled warehousing and transportation companies, AmeriCold Logistics, LLC from December 2002 to May 2006, and CS Integrated from 1999 to 2002.

41.     Defendant Brunot is a citizen of Virginia.

**Defendant Donovan**

42.     Defendant Kathleen E. Donovan ("Donovan") has been a Vice President and the Company's Chief Financial Officer ("CFO") since February 2014. She provided notice of her resignation as CFO on November 7, 2017 "effective at a future date," but continues to serve in that role as of the time of this filing. According to the 2017 Proxy Statement, on July 21, 2017, Defendant Donovan beneficially owned 105,000 shares of the Company's common stock.[5]

---

[5] Includes 105,000 shares of Class A common stock issuable pursuant to stock options exercisable within 60 days of July 21, 2017.

Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $14.10, Donovan owned approximately $1.5 million worth of Liberty stock.

43.    For the fiscal year ended April 30, 2017, Defendant Donovan received $748,235 in compensation from the Company. This included $338,092 in salary, $400,000 in stock awards, and $10,143 in all other compensation.

44.    The Company's 2017 Proxy Statement stated the following about Defendant Donovan:

> *Kathleen E. Donovan.* Ms. Donovan has served as our Vice President and Chief Financial Officer since February 2014. Ms. Donovan previously served as Chief Financial Officer for Catapult Learning, LLC in Camden, New Jersey from 2008 until 2014. From 2005 until 2008, Ms. Donovan served as Chief Financial Officer for MedQuist Inc. in Mt. Laurel, New Jersey. From 1997 until 2005, Ms. Donovan served in multiple positions, including Chief Financial Officer, for Dendrite International in Morristown, New Jersey.

45.    Defendant Donovan is a citizen of Pennsylvania.

**Defendant D'Angelo**

46.    Defendant Gordon D'Angelo ("D'Angelo") has served as a Director since June 2011 and served as Vice President of Business Development from April 2015 to August 17, 2017. According to the 2017 Proxy Statement, on July 21, 2017, Defendant D'Angelo beneficially owned 32,541 shares of the Company's common stock.[6] Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $14.10, D'Angelo owned about $459,000 worth of Liberty stock.

---

[6] Includes 30,847 shares of Class A common stock issuable pursuant to stock options exercisable within 60 days of July 21, 2017 and 1,694 restricted stock units for which shares are issuable within 60 days of July 21, 2017.

47.     For the fiscal year ended April 30, 2017, Defendant D'Angelo received $412,768 in compensation from the Company. This included $45,000 in fees paid or earned in cash, $21,666 in stock awards, $43,333 in option awards and $302,769 in all other compensation.[7]

48.     The Company's 2017 Proxy Statement stated the following about Defendant D'Angelo:

> *Gordon D'Angelo.* Mr. D'Angelo has served as a Director since June 2011. Mr. D'Angelo, has been Vice President, Business Development of the Company since April 2015, assisting with both franchise development and marketing. Mr. D'Angelo also led our Compliance Task Force. Mr. D'Angelo is the co-founder of and until December 2014 was the Chairman of NEXT Financial Group and related entities, an independent registered broker/dealer that provides financial services such as retirement planning, estate planning and investment management through 250 offices in 48 states. Prior to co-founding NEXT Financial in 1998, Mr. D'Angelo was a director of Jackson Hewitt. Mr. D'Angelo brings to the Board of Directors a wealth of experience in the financial services industry, drawing upon his experience from his co-founding of NEXT Financial Group in 1998 where he strengthened his leadership capabilities and management advisory expertise. Mr. D'Angelo also has experience in the tax preparation industry, in that he previously worked for H&R Block before serving as a director of Jackson Hewitt.

49.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant D'Angelo made the following sale of Company stock (and made no purchases of Company stock). On October 10, 2016, Defendant D'Angelo sold 1,587 shares of Company stock for $12.72 per share. Thus, in total, before the fraud was exposed, he sold 1,587 Company shares on inside information, for which he received approximately $20,200. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

---

[7] All other compensation represents compensation received by Defendant D'Angelo for his service as Vice President of Business Development.

50.     Defendant D'Angelo is a citizen of Virginia.

**Defendant Garel**

51.     Defendant John Garel ("Garel") served as a Company director from 2003 until his resignation on December 18, 2017, at which time he was a member of the Audit Committee. On November 10, 2017 he had indicated that he would not stand for re-election, but later elected to resign prior to the annual shareholder meeting, for reasons explored further below. According to the 2017 Proxy Statement, on July 21, 2017, Defendant Garel beneficially owned 57,943 shares of the Company's common stock.[8] Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $14.10, Garel owned about $817,000 worth of Liberty stock.

52.     For the fiscal year ended April 30, 2017, Defendant Garel received $134,999 in compensation from the Company. This included $91,666 in stock awards and $43,333 in option awards.

53.     The Company's 2017 Proxy Statement stated the following about Defendant Garel:

> *John R. Garel.* Mr. Garel has served as a Director since May 2003. From June 2000 until the present, Mr. Garel has served as a Senior Managing Director for Envest Holdings, a private equity management company. As a Senior Managing Director of Envest Holdings, which manages two funds, Mr. Garel has garnered expertise in analysis of investment opportunities and evaluation of business strategies. In his tenure at Envest, Mr. Garel has overseen the deployment of capital across a variety of industries.

54.     Defendant Garel is a citizen of Virginia.

**Defendant Herskovits**

---

[8] Includes (i) 23,504 shares of Class A common stock owned by Mr. Garel; (ii) 32,745 shares of Class A common stock issuable pursuant to stock options exercisable within 60 days of July 21, 2017; and (iii) 1,694 restricted stock units for which shares are issuable within 60 days of July 21, 2017.

55.     Defendant Thomas Herskovits ("Herskovits") served as a Company director from October 2015 to November 2017. According to the 2017 Proxy Statement, on July 21, 2017, Defendant Herskovits beneficially owned 29,829 shares of the Company's common stock.[9] Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $14.10, Herskovits owned about $420,600 worth of Liberty stock.

56.     For the fiscal year ended April 30, 2017, Defendant Herskovits received $122,499 in compensation from the Company. This included $57,500 in fees paid or earned in cash, $21,666 in stock awards, and $43,333 in option awards.

57.     The Company's 2017 Proxy Statement stated the following about Defendant Herskovits:

> *Thomas Herskovits.* Mr. Herskovits has served as a Director since October 2015. Since 2014, Mr. Herskovits has been managing director and operating partner of Feldman Advisors, a middle market investment banking firm based in Chicago, and since 1996, he has managed private investments through Herskovits Enterprises. From 2013 through February 2014, he was CEO of WinView Inc., a technology company. He served on the Board of Directors of that privately-held company from 2012 to 2015. He previously served as non-operating Chairman of the Board of Directors of Natural Golf Corporation, a golf equipment and instruction company, as President & CEO of Specialty Foods, and as President of Kraft Dairy and Frozen Products. Mr. Herskovits' management, finance and consumer products backgrounds provide substantial additional expertise to the Board.

58.     Defendant Herskovits is a citizen of Florida.

**Defendant Howard**

59.     Defendant Robert M. Howard ("Howard") served as a Company director from September 2015 to November 2017, at which time he was a member of the Audit Committee.

---

[9] Includes (i) 977 shares of Class A common stock owned by Mr. Herskovits; (ii) 27,158 shares of Class A common stock issuable pursuant to stock options exercisable within 60 days of July 21, 2017; and (iii) 1,694 restricted stock units for which shares are issuable within 60 days of July 21, 2017.

According to the 2017 Proxy Statement, on July 21, 2017, Defendant Howard beneficially owned 89,243 shares of the Company's common stock.[10] Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $14.10, Howard owned about $1.3 million worth of Liberty stock.

60.     For the fiscal year ended April 30, 2017, Defendant Howard received $124,999 in compensation from the Company. This included $60,000 in fees paid or earned in cash, $21,666 in stock awards, and $43,333 in option awards.

61.     The Company's 2017 Proxy Statement stated the following about Defendant Howard:

> *Robert M. Howard.* Mr. Howard has served as a Director since September 2015. Since 2010, Mr. Howard has served as Chief Investment Officer of GoldKey/PHR Hotels, a hotel management company based in Virginia Beach, Virginia. Mr. Howard joined GoldKey/PHR in 1990 as Controller and subsequently served as Executive Vice President of Finance and Accounting and as Chief Financial Officer. Prior to joining GoldKey/PHR, Mr. Howard provided audit, tax and consulting services with both Ernst & Whinney and with a regional accounting firm. Mr. Howard's management, finance and accounting backgrounds provide substantial expertise to the Board.

62.     Defendant Howard is a citizen of Virginia.

**Defendant Ibbotson**

63.     Defendant Steven Ibbotson ("Ibbotson") served as a Company director from 1999 to December 15, 2017, when he resigned in the middle of a board meeting, effective immediately. According to the 2017 Proxy Statement, on July 21, 2017, Defendant Ibbotson beneficially owned 3,136,272 shares of the Company's common stock, representing

---

[10] Includes (i) 60,938 shares of Class A common stock owned by Mr. Howard; (ii) 26,611 shares of Class A common stock issuable pursuant to stock options exercisable within 60 days of July 21, 2017; and (iii) 1,694 restricted stock units for which shares are issuable within 60 days of July 21, 2017.

approximately 22.5% of the Company's outstanding stock on that date.[11] Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $14.10, Ibbotson owned about $44.2 million worth of Liberty stock.

64.     For the fiscal year ended April 30, 2017, Defendant Ibbotson received $124,999 in compensation from the Company. This included $60,000 in fees paid or earned in cash, $21,666 in stock awards, and $43,333 in option awards.

65.     The Company's 2017 Proxy Statement stated the following about Defendant Ibbotson:

> *Steven Ibbotson.* Mr. Ibbotson has served as a Director since June 1999. Mr. Ibbotson has served as General Manager for Farm Business Consultants, Inc. ("FBC") in Calgary, Alberta since September 1997. From September 1995 until September 1997, he served as a General Manager-Western Canada for FBC, Inc. also in Calgary, Alberta. From September 1993 until September 1995 he served as Director of Marketing for FBC in London, Ontario. FBC is a tax preparation and consulting firm serving farmers and small business owners across Canada. Through his service as General Manager and various other positions at FBC, Mr. Ibbotson brings many years of tax preparation industry expertise to our Board. Mr. Ibbotson has developed significant managerial expertise through his career at FBC and is familiar with many of the operational challenges in the tax preparation industry. Mr. Ibbotson also serves on the Board of Directors' as the representative of our largest stockholder, DataTax Business Services Limited.

66.     Defendant Ibbotson is a citizen of Canada.

### **Defendant Longfield**

67.     Defendant Ross N. Longfield ("Longfield") has served as a Company director since 2001. He is a member of both the Compensation Committee and the Nominating and

---

[11] Includes (i) 93,443 shares of Class A common stock owned by Mr. Ibbotson; (ii) 32,745 shares of Class A common stock issuable pursuant to stock options exercisable within 60 days of July 21, 2017 held by Mr. Ibbotson; (iii) 1,694 restricted stock units for which shares are issuable within 60 days of July 21, 2017 held by Mr. Ibbotson; (iv) 8,400 shares of Class A common stock owned by 714718 Alberta, Ltd., and (v) 2,000,000 shares of Class A common stock owned by Datatax and 1,000,000 shares of Class A common stock issuable upon the exchange of the exchangeable shares of Special Voting Preferred Stock owned by Datatax. Mr. Ibbotson owns a 100% interest in 714718 Alberta, Ltd. Mr. Ibbotson, together with his immediate family, owns a 100% interest in Datatax.

Governance Committee and Chairs the Audit Committee. According to the 2017 Proxy Statement, on July 21, 2017, Defendant Longfield beneficially owned 45,208 shares of the Company's common stock.[12] Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $14.10, Longfield owned over $637,400 worth of Liberty stock. On February 21, 2018, Defendant Longfield submitted his resignation from the Company's Board effective March 21, 2018.

68. For the fiscal year ended April 30, 2017, Defendant Longfield received $124,999 in compensation from the Company. This included $60,000 in fees paid or earned in cash, $21,666 in stock awards, and $43,333 in option awards.

69. The Company's 2017 Proxy Statement stated the following about Defendant Longfield:

> *Ross N. Longfield.* Mr. Longfield has served as a Director since December 2001. Mr. Longfield is managing partner of Longfield Consulting, a financial services firm located in Wyoming. From November 2002 through December 2004, Mr. Longfield served as Chairman of the Board of Incurrent Solutions in Parsippany, New Jersey. From June 1998 until December 2000, Mr. Longfield served as a Managing Director for Household International in Bridgewater, New Jersey. He was Chairman and CEO of Beneficial Bank USA from 1990 to 1998, was a pioneer of the refund anticipation loan concept and has many years of experience in the tax preparation industry. Mr. Longfield brings highly valuable financial and managerial expertise to the Board through his service with Incurrent Solutions, Household International and other public and private companies. Mr. Longfield is highly experienced and knowledgeable in financial analysis, financial statements and risk management, which qualifies him as one of our audit committee financial experts.

70. Defendant Longfield is a citizen of Idaho.

**Defendant McDowell**

---

[12] Includes (i) 10,769 shares of Class A common stock owned by Mr. Longfield; (ii) 32,745 shares of Class A common stock issuable pursuant to stock options exercisable within 60 days of July 21, 2017; and (iii) 1,694 restricted stock units for which shares are issuable within 60 days of July 21, 2017.

71.     Defendant Ellen M. McDowell ("McDowell") has served as a Company director since 2010, and is the sister of Defendant Hewitt. According to the 2017 Proxy Statement, on July 21, 2017, Defendant McDowell beneficially owned 84,518 shares of the Company's common stock.[13] Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $14.10, McDowell owned about $1.2 million worth of Liberty stock.

72.     For the fiscal year ended April 30, 2017, Defendant McDowell received $109,999 in compensation from the Company. This included $45,000 in fees paid or earned in cash, $21,666 in stock awards, and $43,333 in option awards.

73.     The Company's 2017 Proxy Statement stated the following about Defendant McDowell:

> *Ellen M. McDowell.* Ms. McDowell has served as a Director since June 2010. From January 1998 until the present, Ms. McDowell has also served as an Attorney at McDowell, Posternock, Apell & Detrick, P.C., in Maple Shade, New Jersey. Ms. McDowell is the sister of John Hewitt, our Chairman and Chief Executive Officer. Her experience as an attorney provides an important legal perspective for our Board as it considers various operating and business strategies.

74.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant McDowell made the following sales of Company stock (and made no purchases of Company stock). On June 30, 2016, Defendant McDowell sold 2,000 shares of Company stock for $13.48 per share. On July 13, 2016, Defendant McDowell sold 2,000 shares of Company stock for $14.01 per share. On July 10, 2017, Defendant McDowell sold 5,000 shares of Company stock for $13.58 per share.

---

[13] Includes (i) 42,579 shares of Class A common stock owned by Ms. McDowell; (ii) 32,745 shares of Class A common stock issuable pursuant to stock options exercisable within 60 days of July 21, 2017; (iii) 1,694 restricted stock units for which shares are issuable within 60 days of July 21, 2017; and (iv) 7,500 shares held in a trust of which Ms. McDowell is the trustee.

Thus, in total, before the fraud was exposed, she sold 9,000 Company shares on inside information, for which she received over $120,000. Her insider sales were made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate her motive in facilitating and participating in the scheme.

75. Defendant McDowell is a citizen of Pennsylvania.

**Defendant Ossenfort**

76. Defendant Nicole Ossenfort ("Ossenfort") has served as a Company director from November 6, 2017 to February 19, 2018. According to a Form 4 filed on behalf of Defendant Ossenfort on December 14, 2017, Defendant Ossenfort beneficially owned 16,054 shares of the Company's common stock.[14] Given that the price per share of the Company's common stock at the close of trading on December 14, 2017 was $10.90, Defendant Ossenfort owned about $175,000 worth of Liberty stock.  On February 19, 2018, Defendant Ossenfort was appointed as the President and CEO of the Company.

77. For her duties as a director, Defendant Ossenfort received the same compensation as other non-employee Company directors as described in the Company's 2017 Proxy Statement under "Non-Employee Director Compensation."

78. The Company's 8-K filed on November 6, 2017 stated the following about Defendant Ossenfort:

> Nicole Ossenfort, a Certified Public Accountant, operates her own accounting practice, which she founded in 2000. Ms. Ossenfort previously served as Vice President of the Company's 360 Accounting Solutions business from April 2017 to October 2017. Ms. Ossenfort also has been a franchisee of Liberty Tax Service since 2002 with offices in South Dakota and Wyoming and as an Area Developer from 2004 to September 2017. Ms. Ossenfort previously worked in public

---

[14] Includes (i) 14,069 shares of Class A common stock issuable pursuant to stock options exercisable on December 14, 2018; and (ii) 1,988 restricted stock units which vest in full on December 14, 2018.

accounting as an auditor at McGladrey & Pullen from 1994 to 1996. Ms. Ossenfort holds a Bachelor of Science Degree in Accounting (1994) and CPA Certificate.

79.     Defendant Ossenfort is a citizen of South Dakota.

**Defendant Robson**

80.     Defendant George T. Robson ("Robson") served as a Company director from April 1999 to November 2017, at which time he was the chair of the Audit Committee. According to the 2017 Proxy Statement, on July 21, 2017, Defendant Robson beneficially owned 54,566 shares of the Company's common stock.[15] Given that the price per share of the Company's common stock at the close of trading on July 21, 2017 was $14.10, Robson owned about $769,400 worth of Liberty stock.

81.     For the fiscal year ended April 30, 2017, Defendant Robson received $134,999 in compensation from the Company. This included $70,000 in fees paid or earned in cash, $21,666 in stock awards, and $43,333 in option awards.

82.     The Company's 2017 Proxy Statement stated the following about Defendant Robson:

> *George T. Robson.*   Mr. Robson has served as a Director since April 1999.
> Mr. Robson, currently retired, served as the Chief Financial Officer for Dendrite International, a sales and software concern in Morristown, New Jersey from June 1997 until June 2002, and as interim Chief Financial Officer from June to November 2005. Mr. Robson also previously served as the principal of Caversham Associates, a financial consulting firm in Bryn Mawr, Pennsylvania, from June 2002 until April 2006. Mr. Robson was the Chief Financial Officer for H&R Block from January 1996 until May 1997. Mr. Robson brings highly valuable financial expertise to the Board through his experience as the Chief Financial Officer of various companies, including service in our industry as the Chief Financial Officer of H&R Block in the mid-1990s. Mr. Robson is highly

---

[15] Includes (i) 20,127 shares of Class A common stock owned by Mr. Robson; (ii) 32,745 shares of Class A common stock issuable pursuant to stock options exercisable within 60 days of July 21, 2017; and (iii) 1,694 restricted stock units for which shares are issuable within 60 days of July 21, 2017.

experienced and knowledgeable in financial analysis, financial statements and risk management, which qualifies him as one of our audit committee financial experts. Mr. Robson also possesses management advisory experience through his past service as a director of several companies.

83.    Defendant Robson is a citizen of California.

**Defendant Seal**

84.    Defendant John Seal ("Seal") has served as a Company director since November 6, 2017. According to a Form 4 filed on behalf of Defendant Seal on December 14, 2017, Defendant Seal beneficially owned 16,054 shares of the Company's common stock.[16] Given that the price per share of the Company's common stock at the close of trading on December 14, 2017 was $10.90, Defendant Seal owned about $175,000 worth of Liberty stock. Defendant Seal is an Area Developer at the Company.

85.    Defendant Seal receives the same compensation as other non-employee Company directors as described in the Company's 2017 Proxy Statement under "Non-Employee Director Compensation."

86.    The Company's 8-K filed on November 6, 2017 stated the following about Defendant Seal:

John Seal has served as a Liberty Tax Area Developer for the south part of Houston, TX since 2012 and as President, Secretary and Director of JMS Tax Inc. Previously, he was a Liberty Tax franchisee in Hampton Roads, VA and Las Vegas, NV since 2000 and served as VP Finance of Liberty Tax Service, where he assisted in the purchase of U&R Tax Depot (Liberty Tax Canada) and development of Liberty Tax Service in the U.S. He joined the franchise tax preparation industry 28 years ago as a franchisee with Jackson Hewitt Tax Service and, after four tax seasons, joined Jackson Hewitt Corporation as Director of Field Operations. Prior to joining Jackson Hewitt, Mr. Seal spent eight years in operating-division financial management with General Foods Corp. Mr. Seal received his MBA degree from Indiana University.

---

[16] Includes (i) 14,069 shares of Class A common stock issuable pursuant to stock options exercisable on December 14, 2018; and (ii) 1,988 restricted stock units which vest in full on December 14, 2018.

87.     Upon information and belief, Defendant Seal is a citizen of Texas.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

88.     By reason of their positions as officers, directors and/or fiduciaries of Liberty and because of their ability to control the business and corporate affairs of Liberty, the Individual Defendants owed Liberty and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Liberty in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Liberty and its shareholders so as to benefit all shareholders equally.

89.     Each director and officer of the Company owes to Liberty and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

90.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Liberty, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

91.     To discharge their duties, the officers and directors of Liberty were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

92.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The

conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Liberty, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Liberty's Board at all relevant times.

93.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. They also had a duty not to allow Defendant Hewitt to engage in the Sexual and Resource Misconduct.

94.     To discharge their duties, the officers and directors of Liberty were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Liberty were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Virginia, Delaware, the United States, and pursuant to Liberty's own internal guidelines, including its Code of Conduct;

- 24 -

(b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)      remain informed as to how Liberty conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Liberty and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Liberty's operations would comply with all laws and Liberty's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and

- 25 -

accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

95.    Each of the Individual Defendants further owed to Liberty and the shareholders the duty of loyalty requiring that each favor Liberty's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

96.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Liberty and were at all times acting within the course and scope of such agency.

97.    Because of their advisory, executive, managerial, and directorial positions with Liberty, each of the Individual Defendants had access to adverse, non-public information about the Company.

98.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Liberty.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

99.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

100.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act; (ii) to engage in the Sexual and Resource Misconduct; (iii) to conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iv) to artificially inflate the Company's stock price.

101.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Liberty was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

102.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

103.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Liberty and was at all times acting within the course and scope of such agency.

## LIBERTY'S CODE OF CONDUCT

104.    The Company's Code of Conduct (the "Code of Conduct"):

applies to all employees, officers and directors of JTH Holding, Inc. and all of its subsidiaries and affiliates (collectively, the "Company," "Liberty Tax Service," "Liberty Tax" or "Liberty"). Liberty Tax Service expects all employees, officers and directors to be familiar with and to follow this Code of Conduct and any future revisions. If you do not adhere to the Code of Conduct, your employment or board membership may be suspended or terminated.

105.    The Code of Conduct asks employees to consider the following questions, *inter alia*, when evaluating their own actions:

- Do you believe that you are setting the standard of integrity and not just following the law by taking such action?
- Would you be comfortable reading the headlines of the local or national paper if the paper reported your taking such an action?
- Is the action in the long term interests of Liberty Tax Service?
- Would the action adversely affect the Company, its employees, its franchisees or its customers?

106.    With respect to work environment, the Code of Conduct provides:

**Positive Environment**
Liberty Tax Service prohibits harassment of any kind – verbal, physical or visual. If you have been harassed at Liberty Tax Service, you should immediately report the incident to your supervisor, the Human Resources Director or both. Similarly, supervisors are required to report any such incident to the Human Resources Director immediately. Human Resources will promptly and thoroughly investigate any complaints and take appropriate action.

107.    The Code of Conduct provides, in the section titled "Insider Trading," that:

You will be responsible for complying with any insider trading policy that the Company has in effect at any time when the Company's securities are listed or quoted on a securities exchange or other listing authority. Do not engage in any

transactions involving the Company's securities without confirming that you are in compliance with that policy.

108.   The Code of Conduct provides, in the section titled "Avoid Conflicts of Interest,"

that:

> **Financial Interest.** You and your immediate family members cannot have a material financial interest in any supplier that provides products or services to Liberty or Liberty franchisees . . . Material financial interest means a partnership or LLC interest, ownership of stock, options to buy stock, or other ownership interest or debt securities in a company . . .

109.   The Code of Conduct provides, in the section titled "Waivers," that:

> The provisions of this Code of Conduct may be waived for directors or executive officers only by a resolution of the Company's Board of Directors . . . If the Company's securities are publicly traded, then any waiver of this Code of Conduct granted to a director or executive officer may be publicly disclosed along with the reasons for the waiver, to the extent required by the Securities and Exchange Commission, the New York Stock Exchange, and/or any other exchange or listing authority on which the Company's securities are listed or quoted.

110.   The Code of Conduct provides, in the section titled "Restricting Use of Inside

Information," that:

> Under the Insider Trading Policy, Insiders, members of their immediate families, or any trusts over which the Insider has control, may not buy or sell Liberty Healthcare securities or securities of any other publicly-held company, while in possession of Insider Information obtained during the course of employment. This prohibition applies even if the decision to buy or sell is not based on the Inside Information.

111.   The Individual Defendants violated the Code of Conduct by making and/or

causing the Company to make the false and misleading statements and/or omissions discussed

herein and to violate applicable laws and regulations. Defendant Hewitt violated the Code of

Conduct by engaging in the Sexual and Resource Misconduct, while the remaining Individual

Defendants violated the Code of Conduct by allowing the Sexual and Resource Misconduct to

occur. Moreover, three of the Individual Defendants violated the Code of Conduct by engaging in insider trading.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

112. Liberty, founded in 1996, provides tax preparation services and solutions in the United States and Canada. Liberty uses a franchise model to expand its business.

113. Liberty contracts with Area Developers to market the Company's franchises. Area Developers cover a specific geographical region and are required to provide marketing an operational support to franchisees. Area Developers are compensated by a percentage of revenue of those franchisees that they bring in, generally 50% of the franchise fee and royalties.

114. Defendant Hewitt founded Liberty following his ouster from Jackson Hewitt, another tax preparation firm. Because of his experience at Jackson Hewitt, Defendant Hewitt structured Liberty in a manner that would permit him to maintain control over the company. In fact, he referred to his failure to maintain control of Jackson Hewitt as his "billion-dollar mistake" in a piece he wrote for Inc.com, published on March 27, 2017.[17]

115. As a direct result of his experience at Jackson Hewitt, Defendant Hewitt designed the structure Liberty to ensure he retained control of the Company, including, in his own words: ensuring that he chooses "the majority of the board of directors to prevent anyone from taking over the company . . . I want to make sure I'm the one behind the wheel."

---

[17] John Hewitt, *What This Founder Wishes He Had Known Before Starting His First Company (It Cost Him $1 Billion)* INC.COM (March 27, 2017) https://www.inc.com/john-hewitt/notes-to-my-younger-self-what-this-founder-wishes-he-knew-before-starting-first-company.html.

116. Liberty has a dual-class stock structure, with 200,000 shares of Class B stock entitled to elect directors constituting majority of the board,[18] and the remainder being elected by holders of Class A stock and Special Preferred Voting Stock. Defendant Hewitt owns all 200,000 outstanding shares of Class B stock, as well as approximately 15% of outstanding Class A shares.

117. As of mid-2017, when the 2017 Proxy Statement was issued, there were nine directors on the board. Therefore, Defendant Hewitt was able to designate the following five directors: himself, McDowell (his sister), D'Angelo (a longtime friend and business associate); Thomas Herskovits and Robert M. Howard. Of these individuals, the Company's SEC filings admit that only Herskovits and Howard were independent.

118. Beyond the Company's governance structure, Defendant Hewitt has caused the Company to enter into financial arrangements which entrench his position at the Company. For example, Liberty has a revolving credit facility that provides for accelerated repayment should Hewitt no longer control the Company, commonly referred to as a "poison put."[19]

---

[18] Article IV, Section 2(a)(iii) of the Certificate of Incorporation provides that "[t]he holders of the Class B Common Stock shall be entitled to one vote for each share thereof held by them in the election of the minimum number of Directors necessary to constitute a majority of the entire Board of Directors, voting separately and as a class."

[19] The Company's revolving credit facility provides that:

"Change in Control" shall mean the occurrence of one or more of the following events: (i) any sale, lease, exchange or other transfer (in a single transaction or a series of related transactions) of all or substantially all of the assets of the Borrower to any Person or "group" (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder in effect on the date hereof), (ii) occupation of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were neither (a) nominated or elected by the vote or other action of John Hewitt or a Person or Persons Controlled by John Hewitt nor (b) appointed by directors so nominated or elected or (iii) if John Hewitt or a Person or Persons Controlled by John Hewitt ceases to own directly or indirectly, beneficially or of record, securities collectively possessing the power to appoint or elect a majority of the members of the Board of Directors (or persons performing similar functions) of the Borrower.

**A History of Legal and Financial Problems**

119.    In recent years, Liberty has suffered from legal problems and declining financial performance.

120.    In December 2015, three former Liberty employees made hostile work environment allegations against the Company, threatening a lawsuit. They settled for $500,000, despite Defendant Hewitt denying the accusation.

121.    In 2016, the United States Department of Justice sued two former and two then-current Liberty franchisees, alleging fraud in the preparation of consumer tax returns. In the same year, the Company was required to close dozens of offices and set up a compliance group to monitor franchisees more closely. These compliance issues reportedly led to the closure of several of Liberty's largest franchises, compounding an already shrinking market presence. From 2013 to 2017, the number of Liberty franchisees has dropped by 15%, and the number of Liberty Tax locations in the U.S. and Canada has dropped by 10%.

122.    Further, the State of Maryland suspended a Liberty franchisee from operating in the state due to compliance issues in 2017. This action lead to an internal review, although not all recommendations arising out of that review have been implemented.

123.    These issues have led to diminishing financial performance. After achieving net income of nearly $22 million in the 2013-2014 fiscal year, the Company posted net income of approximately $19 million in the 2015-2016 fiscal year and just $13 million in the 2016-2017 fiscal year.

124.     Compliance continues to present issues for Liberty. News outlets reported on February 16, 2018 that four former Liberty tax preparers in Milwaukee have been indicted for conspiracy to defraud the United States for fraud in the preparation of tax returns.

**Defendant Hewitt's Misconduct**

125.     The Company's ethics hotline received a complaint on July 12, 2017, which alleged that one or more employees had heard Defendant Hewitt engaging in sexual activity in his office.

126.     This was apparently not the first time the issue had surfaced, with incidents reported to have been first raised in November 2015, and continuing through August 2017.

127.     The Audit Committee of the Board, comprised of Defendants Robson, Garel, Howard, and Longfield, received the complaint, and commissioned Skadden to investigate it.

128.     Skadden's investigation, which spanned roughly two months, uncovered additional allegations that Defendant Hewitt engaged in romantic relationships with as many as ten franchisees and/or employees, and provided those individuals with preferential treatment. It has been alleged that Defendant Hewitt conducted these relationships in a manner that created a hostile workplace for other employees. In addition, the investigation uncovered allegations that Defendant Hewitt used Liberty resources for his personal benefit.

129.     Defendant Hewitt refused to cooperate with the investigation.

130.     In connection with his notification the he would not seek re-election to the Board, Defendant Garel publicly disclosed that the investigation revealed "credible evidence that Mr. Hewitt had engaged in an array of inappropriate conduct, both personally and involving business matters, while serving as Liberty Tax's CEO and Chairman."

131.    Skadden presented the results of its investigation to the Audit Committee on September 5, 2017, and in writing thereafter.

132.    The investigation report has not been published by the Company, but the Virginia Beach Newspaper the *Virginian-Pilot* has quoted from and summarized the report.

133.    The Skadden investigation revealed that Defendant Hewitt had: (1) romantic relationships with at least one employee, and possibly with ten others; (2) permitted an employee he was allegedly seeing romantically to purchase a Liberty franchise with no money down, and then bought back the franchise after the relationship ended at a higher price than it had been sold for,[20] in contravention of usual policy; (3) hired relatives of female employees he had been seeing romantically; and (4) facilitated the provision of a business loan to a franchisee who had been initially rejected for the loan, following email messages from the franchisee to Defendant Hewitt stating "I love you" and "I miss you" (collectively, the "Sexual Misconduct").

134.    In addition to the Sexual Misconduct, Skadden investigated Defendant Hewitt for using Company resources for personal gain. These included allegations that the Defendant Hewitt strategically scheduled out-of-town meetings and trainings to attend New York Yankees baseball games and made charges on a Company credit card at a New York racetrack.

135.    Further, Defendant Hewitt purchased an Italian restaurant in Virginia Beach, La Bella Italia, in October 2015 through his company, JTHJR, Inc. Defendant D'Angelo brokered the deal.

136.    Following his acquisition of La Bella Italia, Defendant Hewitt began directing Liberty business to the restaurant, holding lunch meetings, throwing parties and hosting cocktail

---

[20] The franchise was purchased for four times its revenue, and bought back at seven times its revenue, plus $120,000 cash and $100,000 in Liberty stock.

hours for prospective franchisees. The previous owner of the restaurant has stated that Defendant Hewitt hosted Liberty events at La Bella Italia "every week."

137.    The Company has made no disclosure of how much money it has spent at La Bella Italia, or whether the use of the restaurant has been approved under the Company's related-party transaction policies. The use of La Bella Italia is not disclosed in the Company's quarterly or annual filings with the SEC.

138.    *The Virginian-Pilot* asked Liberty's General Counsel Vanessa Szajnoga about the use of La Bella Italia.[21] She disclaimed any knowledge of the amount of Liberty money spent at the restaurant, and claims that there is no conflict, citing the fact that Liberty does not have an ownership interest in La Bella Italia.

139.    Defendant Hewitt misused company resources by: (1) scheduling out-of-town meetings to facilitate his attendance at Yankees games; (2) making charges on a Company credit card at a New York racetrack; and (3) directing Company business to a restaurant that he had an ownership interest in (collectively, the "Resource Misconduct").

140.    Defendant Garel has stated that in addition to failing to cooperate with Skadden's investigation, Defendant Hewitt "failed to, in any way, attempt to address or alleviate the concerns of employees. Rather, Mr. Hewitt continued to engage in the same underlying behavior."

### Defendant Hewitt's Termination and the Board's Ouster Attempt

141.    As a result of the reports of the Sexual Misconduct, and during the time that the Skadden investigation was ongoing, the Board apparently began efforts to oust Defendant

---

[21] Kimberly Pierceall, *Liberty Tax ex-CEO Bought Restaurant While Leading Company. Was it a Conflict of Interest?*, THE VIRGINIAN-PILOT (Oct. 31, 2017) https://pilotonline.com/business/consumer/liberty-tax-ex-ceo-bought-restaurant-while-leading-company-was/article_a82ff66c-f57b-5989-aa25-6adf1bd7ad60.html.

Hewitt. According to Defendant Garel, a Special Committee of the Board was convened in late July 2017 "to negotiate with Mr. Hewitt for [the] purchase of his class B control shares, and his full separation from any Board or managerial activities." The "Special Committee worked with management, advisors, and the Company's lenders."

142.    The Board terminated Defendant Hewitt as CEO on September 5, 2017, reporting in a September 6, 2017 press release that "the Board has determined that it is in the Company's best interests to terminate Mr. Hewitt at this time." The press release reported that "[t]he Company had engaged in a deliberate succession planning process, which resulted in Ed Brunot joining the Company as Chief Operating Officer as an interim step before assuming the role of CEO."

143.    As the Class B directors control a majority of the board, at least one of the directors elected by Defendant Hewitt must have voted in favor of his termination.

144.    The Company determined that it had a good faith basis to terminate Defendant Hewitt for cause, but elected not to do so. As a result, Defendant Hewitt was "eligible for severance, which amounted to $801,005 in a lump-sum payment, 18 months of health benefits and $471,210 in unvested stock awards that had been accelerated," as reported by *The Virginian-Pilot*.

145.    The September 6, 2017 press release noted that the Company was in negotiations to separate Defendant Hewitt from the firm and repurchase his Class B shares, but no such agreements had been reached, "and whether the Company will enter into such agreements with Mr. Hewitt remains uncertain at this time."

146.    Those members of the board elected by public shareholders demanded that "Hewitt (i) be removed immediately as Chairman by the Board, (ii) voluntarily agree to resign from the Board, (iii) agree to the Company's September 28 offer to purchase his Class B shares, and (iv) issue a press release about the Audit Committee report concerning Mr. Hewitt's conduct in order to best position the Company to deal with the ramifications of any press coverage about the report and protect its reputation."

147.    According to Defendant Garel, "[o]n September 28th, 2017, the Special Committee offered Mr. Hewitt its final approved proposal, which Mr. Hewitt rejected."

148.    Defendant Hewitt responded by removing two Class B directors, Defendant Herskovits and Defendant Howard, on November 6, 2017, replacing them with Defendant Ossenfort and Defendant Seal. Defendants Ossenfort and Seal are both close business associates of Defendant Hewitt.

149.    Defendants Ossenfort and Seal are both Area Developers who have secured their territories through Company loans.

150.    Defendant Hewitt has continued to attempt to exert managerial control over the Company, including by interacting with Liberty franchisees and Area Developers. These actions come despite November 9, 2017 representations to KPMG "that he would not reinsert himself into the management of" Liberty.

151.    Because of Hewitt's continued interference with the operations of Liberty, a number of individuals, including officers and directors, and the Company's auditor, have departed:

- Class A independent director George Robson resigned November 6, 2017, effective immediately;

- CFO Kathleen Donovan resigned on November 7, 2017, despite Liberty offering her a retention bonus after Defendant Hewitt's firing;

- Class A independent director Defendant Garel advised the board on November 9, 2017 that he would not stand for reelection at the next annual meeting. Defendant Garel announced his decision in a letter, which clearly set forth that Defendant Hewitt's control of the Company via his Class B shares, and his resulting control of Liberty, allow Defendant Hewitt to manage the Company. Defendant Garel stated that Defendant Hewitt's "conduct and refusal to do what I believe is appropriate on behalf of the Company and its stockholders" had driven his decision not to stand for reelection.

- Independent auditor KPMG resigned on December 8, 2017. KPMG stated that Defendant Hewitt's conduct has "created an inappropriate tone at the top which leads to ineffective entity level controls over the organization." The Company reported that Defendant Hewitt's conduct and continued involvement with Liberty, "has led [KPMG] to no longer be able to rely on management's representations, and therefore has caused KPMG to be unwilling to be associated with the Company's consolidated financial statements." "KPMG also noted that because certain information known to the Board regarding the reasons that the Board terminated Mr. Hewitt as Chief Executive Officer had not been disclosed to the current Chief Executive Officer and Chief Financial Officer, KPMG was uncertain as to whether it could continue to rely on management's representations."

- Class A independent director Defendant Ibbotson resigned from the board on December 15, 2017. This resignation, effective immediately, came in the middle of a board meeting. He followed up with a letter, stating:

> I made the decision to resign because I materially disagree with certain aspects of how the Company is being managed by Mr. Hewitt as a result of his rights as the sole holder of the Class B common stock and voting control at the board level. Despite my best efforts, I no longer believe that I can have a meaningful influence on the management of the company, and accordingly, I no longer believe that I can be an effective member of the Board of Directors in serving the interests of shareholders and therefore am compelled to resign.

- Defendant Garel announced on December 18, 2017, that he was resigning effective immediately, rather than finishing his term. In a letter to the Board, Defendant Garel stated:

> The Class B Directors are acting in unison through Mr. Hewitt's Class B rights and are, in my judgment, unwilling to consider input that interferes with their objectives, with which I materially disagree.
>
> It is now incumbent upon me to notify the Board and the stockholders that I am no longer able to exercise my Director responsibilities, and that the combined actions of the Class B Directors have put an end to my tenure as an Independent Director by rendering the remainder of my term as mere form over substance.

152.    In addition, on the date the ethics complaint was made, the Company's Chief Accounting Officer gave notice of his retirement on August 11, 2017. The Company's Vice President of Financial products gave notice of his retirement on future date on September 5, 2017, the date Defendant Hewitt was fired as CEO.

153.    Defendant Hewitt's Sexual Misconduct and Resource Misconduct have created chaos at Liberty, and significantly damaged Liberty's reputation.

154.    The resignation of KPMG has delayed the Company's filing of its Form 10-Q for the quarter ended October 31, 2017. The Company has not yet retained an independent auditor

and may not be able to do so. The Company cancelled its December 7, 2017 earnings call on December 6, 2017.

155.    Liberty has been required incur costs associated with renegotiating contracts and providing retention bonus to stem the loss of executive talent. Such expenditures include cash bonuses of approximately $375,000 and restricted stock unit awards of approximately 25,000 RSUs.

156.    On December 19, 2017, the Company received a notice from NASDAQ alerting Liberty that it was in violation of listing rules for failure to timely file a Form 10-Q for the quarter ended October 31, 2017.

157.    On January 2, 2018, the Company received a notice from NASDAQ stating that due to the resignations of Defendants Garel and Ibbotson, both of whom served on the Audit Committee, the Company is no longer in compliance with NASDAQ listing rule 5605(c)(2). That rule requires that the Audit Committee must consist of three independent members of the board. The notice provided the Company with until February 16, 2018 to submit a plan to regain compliance. The Company has reported that it has filed a plan within the deadline, but provided no details of the plan.

158.    The Boards' committees are essentially defunct, with Defendant Longfield, the only remaining Class A director, serving alone on all three committees.

159.    Yet, on February 21, 2018, Defendant Longfield submitted his resignation as a director on the Company's Board, effective March 21, 2018. The Company filed a Form 8-K with the SEC on February 21, 2018 that described the reasons set forth in a letter from Defendant Longfield for his resignation. The Form 8-K states, in pertinent part:

In a letter to the Board, dated February 21, 2018, Mr. Longfield indicated that his decision to resign was a result of his continued concerns regarding tone at the top as previously noted by the Company's former independent public accounting firm, KPMG, LLP and the results of the Board meeting held on February 19, 2018 where Mr. Hewitt, in his role as Chairman of the Board and sole Class B shareholder, proposed and had passed by the majority Class B board members the following actions: (i) termination of the employment of certain management of the Company, including the termination of Edward L. Brunot as President and Chief Executive Officer and Kathleen Donovan as a short-term consultant, (ii) appointment of Nicole Ossenfort, a Class B director, as President and Chief Executive Officer of the Company, (iii) appointment of two individuals to serve in other Company executive management positions, (iv) replacement of the Company's law firm Skadden Arps, Slate, Meagher & Flom LLP, (v) appointment of the law firm of Williams Mullen to serve as the company's Corporate General Counsel, (vi) termination of the board approved process which had previously engaged a board recruitment search firm hired by the Company to assist with recruitment efforts to fill the Class A director vacancies on the Board and (vii) in place of the nominating process, submission by Mr. Hewitt of candidates for consideration to fill the three Class A director vacancies.

160.    On February 23, 2018, Vanessa M. Szajnoga, Vice President and General Counsel of the Company, and Richard G. Artese, Vice President and Chief Information Officer of the Company, each provided the Company with a notice of resignation, effective immediately.

**Materially False and Misleading Statements**

161.    The Individual Defendants made and/or caused the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, prospects, and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make the following false and misleading statements that failed to disclose that: (1) Defendant Hewitt, as Liberty's CEO, created an inappropriate "tone at the top"; (2) Defendant Hewitt engaged in the Sexual Misconduct; (3) Defendant Hewitt engaged in the Resource Misconduct; (4) the Company failed to maintain internal controls; and (5) as a

result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lack a reasonable basis at all relevant times.

### *2015-2016 10-K*

162.    On June 29, 2016, Liberty filed its annual report with the SEC announcing the Company's financial results for the quarter and year ended April 30, 2016, on Form 10-K (the "2015-2016 10-K"), signed by Defendants Hewitt, Donovan, D'Angelo, Garel, Herskovits, Howard, Ibbotson, Longfield, McDowell, and Robson.

163.    Regarding Defendant Hewitt's control over Liberty, the 2015-2016 10-K stated:

> *We are controlled by* **our** *Chairman and Chief Executive Officer, whose interests in our business may be different from those of our stockholders.*
> John Hewitt, our Chairman and Chief Executive Officer, currently owns all outstanding shares of our Class B common stock. Our Class B common stock has the power to elect, voting as a separate class, the minimum number of directors that constitute a majority of the Board of Directors. As a result, Mr. Hewitt will, for the foreseeable future, have significant influence over our management and affairs, given the Board's authority to appoint or replace our senior management, cause us to issue additional shares of our Class A common stock or repurchase Class A common stock, declare dividends, or take other actions. Upon Mr. Hewitt's death, pending the effectiveness of a provision of our certificate of incorporation that will become effective only after we have conducted an initial public offering or certain other triggering events occur, Mr. Hewitt's estate would succeed to these special voting rights. Mr. Hewitt may make decisions regarding our Company and business that are opposed to other stockholders' interests or with which they disagree. Mr. Hewitt's ability to elect a majority of the Board of Directors may also delay or prevent a change of control of us, even if that change of control would benefit our stockholders, which could deprive an investor of the opportunity to receive a premium for your Class A common stock. The power to elect a majority of the directors may adversely affect the value of our Class A common stock due to investors' perception that conflicts of interest may exist or arise. To the extent that the interests of our other stockholders are harmed by the actions of Mr. Hewitt, the price of our Class A common stock may be harmed. For information regarding the ownership of our outstanding stock, please see the section titled "Item 12-Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters."

164.    Regarding Liberty's disclosure controls and procedures, the 2015-2016 10-K stated:

**Item 9A. Controls and Procedures.**

The Company's disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the Company's reports filed under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, including, without limitation, that such information is accumulated and communicated to Company management, including the Company's principal executive and financial officer, as appropriate, to allow timely decisions regarding required disclosures.

***Evaluation of Disclosure Controls and Procedures***

The Company, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and the Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Exchange Act) as of April 30, 2016. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of April 30, 2016, the Company's disclosure controls and procedures were effective in providing reasonable assurance that material information is recorded, processed, summarized, and reported by management of the Company on a timely basis in order to comply with the Company's disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.

***Management's Report on Internal Control Over Financial Reporting***

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) and 15d-15(f) under the Exchange Act). The Company's internal control over financial reporting is designed to provide reasonable assurance to the Company's management and Board of Directors regarding the reliability of financial reporting and preparation of financial statements for external purposes in accordance with GAAP.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

Management assessed the effectiveness of the Company's internal control over financial reporting as of April 30, 2016. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the

Treadway Commission in Internal Control – Integrated Framework (2013). Based on this assessment, management believes that, as of April 30, 2016, the Company's internal control over financial reporting was effective based on those criteria.

***Changes in Internal Control over Financial Reporting***
During the quarter ended April 30, 2016, there were no changes that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

165.    Attached to the 2015-2016 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Hewitt and Donovan attesting to the accuracy of the 2014 10-K.

***2016 Proxy Statement***

166.    On August 8, 2016, the Company filed a Schedule 14A with the SEC (the "2016 Proxy Statement").  The 2016 Proxy Statement failed to disclose that: (1) Defendant Hewitt, as Liberty's CEO, created an inappropriate "tone at the top"; (2) Defendant Hewitt engaged in the Sexual Misconduct; (3) Defendant Hewitt engaged in the Resource Misconduct; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lack a reasonable basis at all relevant times.

***Q1 2016-2017 10-Q***

167.    On September 2, 2016, Liberty filed a quarterly report for the fiscal quarter ended July 31, 2016 on Form 10-Q (the "Q1 2016-2017 10-Q"), signed by Defendants Hewitt and Donovan, providing the Company's quarterly financial results and position.

168.    The Q1 2016-2017 10-Q provided the following disclosure regarding the Company's controls and procedures:

**ITEM 4**

## CONTROLS AND PROCEDURES

### *Evaluation of Disclosure Controls and Procedures*

We, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of July 31, 2016. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of July 31, 2016, our disclosure controls and procedures were effective in providing reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.

169.     Attached to the Q1 2016-2017 10-Q were SOX certifications signed by Defendants Hewitt and Donovan, attesting to the accuracy of the Q1 2016-2017 10-Q.

### *Q2 2016-2017 10-Q*

170.     On December 9, 2016, Liberty filed a quarterly report for the fiscal quarter ended October 31, 2016 on Form 10-Q (the "Q2 2016-2017 10-Q"), signed by Defendants Hewitt and Donovan, providing the Company's quarterly financial results and position.

171.     Q2 2016-2017 10-Q provided the following disclosure regarding the Company's controls and procedures:

## ITEM 4
## CONTROLS AND PROCEDURES

### *Evaluation of Disclosure Controls and Procedures*

We, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of October 31, 2016. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of October 31, 2016, our disclosure controls and procedures were effective in

- 45 -

providing reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.

172.    Attached to the Q2 2015 10-Q were SOX certifications signed by Defendants

Hewitt and Donovan, attesting to the accuracy of the Q2 2015 10-Q.

### Q3 2016-2017 10-Q

173.    On March 9, 2017, Liberty filed a quarterly report for the fiscal quarter ended

January 31, 2017 on Form 10-Q (the "Q3 2016-2017 10-Q"), signed by Defendants Hewitt and

Donovan, providing the Company's quarterly financial results and position.

174.    The Q3 2016-2017 10-Q provided the following disclosure regarding the

Company's controls and procedures:

**ITEM 4**
**CONTROLS AND PROCEDURES**

*Evaluation of Disclosure Controls and Procedures*

We, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of January 31, 2017. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of January 31, 2017, our disclosure controls and procedures were effective in providing reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.

175.    Attached to the Q3 2016-2017 10-Q were SOX certifications signed by

Defendants Hewitt and Donovan, attesting to the accuracy of the Q3 2016-2017 10-Q.

### 2016-2017 10-K

176.    On July 7, 2017, Liberty filed its annual report with the SEC announcing the

Company's financial results for the quarter and year ended April 30, 2017 on Form 10-K (the

"2016-2017 10-K"), signed by Defendants Hewitt, Donovan, D'Angelo, Garel, Herskovits,

Howard, Ibbotson, Longfield, McDowell, and Robson.

177.    Regarding Defendant Hewitt's control over Liberty, the 2016-2017 10-K stated:

***We are controlled by* our *Chairman and Chief Executive Officer, whose interests in our business may be different from those of our stockholders.***
John Hewitt, our Chairman and Chief Executive Officer, currently owns all outstanding shares of our Class B common stock. Our Class B common stock has the power to elect, voting as a separate class, the minimum number of directors that constitute a majority of the Board of Directors. As a result, Mr. Hewitt will, for the foreseeable future, have significant influence over our management and affairs, given the Board's authority to appoint or replace our senior management, cause us to issue additional shares of our Class A common stock or repurchase Class A common stock, declare dividends, or take other actions. Upon Mr. Hewitt's death, pending the effectiveness of a provision of our certificate of incorporation that will become effective only after we have conducted an initial public offering or certain other triggering events occur, Mr. Hewitt's estate would succeed to these special voting rights. Mr. Hewitt may make decisions regarding our Company and business that are opposed to other stockholders' interests or with which they disagree. Mr. Hewitt's ability to elect a majority of the Board of Directors may also delay or prevent a change of control of us, even if that change of control would benefit our stockholders, which could deprive an investor of the opportunity to receive a premium for your Class A common stock. The power to elect a majority of the directors may adversely affect the value of our Class A common stock due to investors' perception that conflicts of interest may exist or arise. To the extent that the interests of our other stockholders are harmed by the actions of Mr. Hewitt, the price of our Class A common stock may be harmed. For information regarding the ownership of our outstanding stock, please see the section titled "Item 12-Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters."

178.    Regarding Liberty's disclosure controls and procedures, the 2016-2017 10-K

stated:

**Item 9A. Controls and Procedures.**
The Company's disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in the Company's

reports filed under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, including, without limitation, that such information is accumulated and communicated to Company management, including the Company's principal executive and financial officer, as appropriate, to allow timely decisions regarding required disclosures.

### *Evaluation of Disclosure Controls and Procedures*

The Company, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and the Chief Financial Officer, has evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of April 30, 2017. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of April 30, 2017, the Company's disclosure controls and procedures were effective in providing reasonable assurance that information required to be filed by the Company in the reports if files or submits under the Exchange Act is recorded, processed, summarized, and reported by management of the Company on a timely basis in order to comply with the Company's disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.

### *Management's Report on Internal Control Over Financial Reporting*

Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act). The Company's internal control over financial reporting is designed to provide reasonable assurance to the Company's management and Board of Directors regarding the reliability of financial reporting and preparation of financial statements for external purposes in accordance with GAAP.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation.

Management assessed the effectiveness of the Company's internal control over financial reporting as of April 30, 2017. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control – Integrated Framework (2013). Based on this assessment, management believes that, as of April 30, 2017, the Company's internal control over financial reporting was effective based on those criteria.

### *Changes in Internal Control over Financial Reporting*

During the quarter ended April 30, 2017, there were no changes that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

179.    Attached to the 2016-2017 10-K were SOX certifications signed by Defendants Hewitt and Donovan, attesting to the accuracy of the 2016-2017 10-K.

### 2017 Proxy Statement

180.    On August 14, 2017, the Company filed its 2017 Proxy Statement.   The 2017 Proxy Statement failed to disclose that: (1) Defendant Hewitt, as Liberty's CEO, created an inappropriate "tone at the top"; (2) Defendant Hewitt engaged in the Sexual Misconduct; (3) Defendant Hewitt engaged in the Resource Misconduct; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lack a reasonable basis at all relevant times.

### Q1 2017-2018 10-Q

181.    On September 11, 2017, Liberty filed a quarterly report for the fiscal quarter ended July 31, 2017 on Form 10-Q (the "Q1 2017-2018 10-Q"), signed by Defendant Donovan, providing the Company's quarterly financial results and position.

182.    The Q1 2017-2018 10-Q provided the following disclosure regarding the Company's controls and procedures:

**ITEM 4**
**CONTROLS AND PROCEDURES**

### Evaluation of Disclosure Controls and Procedures

We, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as

amended (the "Exchange Act") as of July 31, 2017. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that, as of July 31, 2017, our disclosure controls and procedures were effective in providing reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported by our management on a timely basis in order to comply with our disclosure obligations under the Exchange Act and the rules and regulations promulgated thereunder.

183.    Attached to the Q1 2017-2018 10-Q were SOX certifications signed by Defendants Brunot and Donovan, attesting to the accuracy of the Q1 2017-2018 10-Q.

184.    The statements in ¶¶ 162-165, 167-179, and 181-183 were materially false and misleading because they made misleading statements that failed to disclose that: (1) Defendant Hewitt, as Liberty's CEO, created an inappropriate "tone at the top"; (2) Defendant Hewitt engaged in the Sexual Misconduct; (3) Defendant Hewitt engaged in the Resource Misconduct; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lack a reasonable basis at all relevant times.

**The Truth Emerges**

185.    On November 7, 2017, Liberty filed a Form 8-K with the SEC announcing that Defendant Donovan had resigned her position as CFO, "effective at a future date."

186.    In response, Liberty shares dropped nearly 17%, or $2.25 per share, to close at $11 per share on November 8, 2017.

187.    Liberty filed a Form 8-K with the SEC on December 11, 2017, announcing the abrupt resignation of KPMG as the Company's independent registered accounting firm. The Form 8-K further disclosed that the filing of the Form 10-Q for the quarter ended October 31, 2017 would be delayed. The Form 8-K, stated, in relevant part:

**Item 4.01. Changes in Registrants Certifying Accountant.**
On December 8, 2017, KPMG LLP ("KPMG") resigned as the independent registered public accounting firm of Liberty Tax, Inc. (the "Company"), effective immediately, and KPMG's resignation was accepted and approved by the Audit Committee of the Board of Directors of the Company (the "Board"). The Company is currently in the process of finding a successor independent registered public accounting firm in the hope that the Company's financial statements for the second quarter ended October 31, 2017 can be completed with as little delay as possible.

188.    The Form 8-K continued, describing KPMG's concerns with Defendant Hewitt:

*KPMG expressed to the Audit Committee and Company management its concern that the actions of former Chief Executive Officer John T. Hewitt, who remains the Chairman of the Board and controlling stockholder as the sole holder of the Company's outstanding Class B common stock, have created an inappropriate tone at the top which leads to ineffective entity level controls over the organization*. Prior to the termination of Mr. Hewitt's employment as Chief Executive Officer of the Company on September 5, 2017, the Audit Committee oversaw an investigation of allegations of misconduct by Mr. Hewitt. In particular, KPMG noted that Mr. Hewitt took actions to replace two independent members of the Board around the time information relating to this investigation appeared in media reports. KPMG also noted that following the replacement by Mr. Hewitt of two Class B directors, the chair of the Audit Committee retired from the Board, the Company's Chief Financial Officer announced her intention to resign from the Company, and another independent member of the Board announced that he would not stand for reelection at the Company's next annual meeting. Further, KPMG was made aware that following his termination as Chief Executive Officer, Mr. Hewitt may have continued to interact with franchisees and area developers of the Company. *Although Mr. Hewitt stated to KPMG during a meeting on November 9, 2017 that he would not reinsert himself into the management of the Company, in light of Mr. Hewitt's actions and his ability to control the Board as the sole holder of the Class B common stock, KPMG informed the Audit Committee and management that it has concerns regarding the Company's internal control over financial reporting as related to integrity and tone at the top and such matters should be evaluated as potential material weaknesses*.

Specifically, *KPMG informed the Audit Committee and management that Mr. Hewitt's past and continued involvement in the Company's business and operations, including his continued interactions with franchisees and area developers of the Company, has led it to no longer be able to rely on management's representations, and therefore has caused KPMG to be unwilling to be associated with the Company's consolidated financial*

*statements*. In notifying the Company of its resignation, KPMG advised the Audit Committee and management that it is not aware of any information that cause it to question the integrity of current management, but rather that the structural arrangement by which Mr. Hewitt controls the Company is the cause of KPMG's concerns. KPMG also noted that because certain information known to the Board regarding the reasons that the Board terminated Mr. Hewitt as Chief Executive Officer had not been disclosed to the current Chief Executive Officer and Chief Financial Officer, KPMG was uncertain as to whether it could continue to rely on management's representations.

(Emphasis added.)

189.    Finally, the Form 8-K informed investors that, as a result of KPMG's departure,

the filing of the Company's Form 10-Q for the quarter ended October 31, 2017 with the SEC

would be delayed.

### Item 8.01. Other Events.

On December 11, 2017, the Company issued a press release announcing the resignation of KPMG as the Company's independent registered public accounting firm and that ***the Company will delay the filing of its Quarterly Report on Form 10-Q for the quarter ended October 31, 2017***. A copy of the press release is attached hereto as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated herein by reference.

(Bold heading in original. Bold & italic emphasis added.)

190.    On this news, the price of Liberty shares fell more than 6%, or $0.80 per share,

from their previous closing price, closing at $11.15 per share on December 11, 2017.

191.    On December 19, 2017, the Company issued a press release titled "Liberty Tax

Service Receives Notice of Delinquent Filing," which stated, in relevant part:

Liberty Tax, Inc. (NASDAQ:TAX), the parent company of Liberty Tax Service, announced today that, as a result of its failure to timely file its Quarterly Report on Form 10-Q for the fiscal quarter ended October 31, 2017 (the "Form 10-Q"), it has received a notice from Nasdaq that the Company is not in compliance with Nasdaq's continued listing rules under the timely filing criteria established under Nasdaq Listing Rule 5250(c)(1) of the Nasdaq rules . . . the Company is still in the process of engaging a new independent registered public accounting firm.

- 52 -

192.     As of the date of this filing, the Company had yet to file with the SEC Form 10-Q for the quarter ended October 31, 2017.

193.     On January 8, 2018, the Company filed an 8-K with the SEC admitting that it had received a notice from NASDAQ informing Liberty that the Company was not in compliance with NASDAQ listing rule 5605(c)(2), which requires the Audit Committee consist of at least three members, each of whom must be independent. Since the departure of Defendants Garel and Ibbotson, Defendant Longfield has been the Chair and sole member of Liberty's Audit Committee.

194.     As of the close of trading on March 1, 2018, the price per share of Liberty stock had fallen to $7.80.

**<u>Repurchases</u>**

195.     During the period in which the Company made false and misleading statements and/or omissions, the Individual Defendants caused the Company to initiate repurchases of its common stock at artificially inflated prices that substantially damaged the Company.

196.     As the Company stock was actually only worth $7.80 per share, the price at closing on March 1, 2018, the Company overpaid $158,598 in total for these repurchases.

197.     According to the Company's Form 10-Q filed with the SEC on December 9, 2017, in the quarter ended October 31, 2017, the Individual Defendants caused the Company to repurchase 3,118 shares of its own common stock at an average price per share of approximately $12.62, for a total cost to the Company of approximately $39,350.

198.     Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid

on average $4.82 more than the actual worth of each share during the quarter ended October 31, 2017. Thus, the total over payment by the Company for its repurchases of its own stock during the quarter ended March 31, 2017 was approximately $15,031.

199.    According to the Company's Form 10-Q filed with the SEC on March 9, 2017, in the quarter ended January 31, 2018, the Individual Defendants caused the Company to repurchase 30,035 shares of its own common stock from an affiliate of a director at an average price per share of approximately $12.58, for a total cost to the Company of approximately $377,840.

200.    Due to the artificial inflation of the Company's stock price caused by misrepresentations alleged to have been made by the Individual Defendants, the Company paid on average $4.78 more than the actual worth of each share during the quarter ended January 31, 2018. Thus, the total over payment by the Company for its repurchases of its own stock during the quarter ended January 31, 2018 was approximately $143,567.

201.    In total, the Company overpaid an aggregate amount of approximately $158,598 for repurchases of its own stock during the period of time in which the Company made false and misleading statements and omissions.

### Summary of Individual Defendants' Misconduct

202.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) Defendant Hewitt, as Liberty's CEO,

created an inappropriate "tone at the top"; (2) Defendant Hewitt engaged in the Sexual Misconduct; (3) Defendant Hewitt engaged in the Resource Misconduct; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lack a reasonable basis at all relevant times.

203.   The Individual Defendants also failed to correct and/or caused the Company to fail to correct the foregoing false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

204.   Defendant Hewitt breached his fiduciary duties by engaging in the Sexual and Resource Misconduct.

205.   The rest of the Individual Defendants breached their fiduciary duties by allowing Defendant Hewitt to engage in the Sexual and Resource Misconduct.

206.   The Individual Defendants also breached their fiduciary duties by approving the severance payment to Defendant Hewitt consisting of $801,005 in a lump-sum payment, 18 months of health benefits and $471,210 in unvested stock awards that had been accelerated.

207.   The Individual Defendants further breached their fiduciary duties by causing the resignation of the Company's independent auditor by failing to heed the promise to KPMG that Defendant Hewitt "would not reinsert himself into the management of" Liberty, and by causing the Company's loss of key executive officers and directors.

208.   Additionally, while the Individual Defendants caused the Company's stock to be artificially inflated, the Individual Defendants caused the Company to overpay for repurchases of

Company stock, and three of the Individual Defendants benefitted themselves by engaging in insider sales.

209.    Lastly, the Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain internal controls.

## DAMAGES TO LIBERTY

210.    As a direct and proximate result of the Individual Defendants' conduct, Liberty is losing and expending, and will lose and expend, many millions of dollars.

211.    Such expenditures include, but are not limited to, the costs of the Skadden investigation and legal fees and payments associated with the Securities Class Actions filed against the Company and three of the Individual Defendants, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

212.    Such expenditures include those charges the Company incurred by wrongfully paying for Defendant Hewitt's personal expenses.

213.    Such expenditures further include the severance payment to Defendant Hewitt consisting of $801,005 in a lump-sum payment, 18 months of health benefits and $471,210 in unvested stock awards that had been accelerated.

214.    Such losses include those caused by the loss of key executive officers and directors and the Company's independent auditor.

215.    Such losses include the Company's overpayment by approximately $158,598 for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

216.    Such costs include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

- 56 -

217.    As a direct and proximate result of the Individual Defendants' conduct, Liberty has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

218.    Plaintiff brings this action derivatively and for the benefit of Liberty to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Liberty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

219.    Liberty is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

220.    Plaintiff is, and has been at all relevant times, a Liberty shareholder. Plaintiff will adequately and fairly represent the interests of Liberty in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

221.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

222.    A pre-suit demand on the Board of Liberty is futile and, therefore, excused. At the time of filing of this action, the Board consists of six Individual Defendants, who are Hewitt, D'Angelo, Longfield, McDowell, and Seal (collectively, the "Director-Defendants") and non-

party William Minner, Jr. (together with the Director-Defendants, the "Directors"), who was appointed by Defendant Hewitt to the Board on February 19, 2018. Plaintiff only needs to allege demand futility as to three of the six Directors who are on the Board at the time this action is commenced.

223.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to allow or engage in the Sexual and Resource Misconduct, to cause the resignation of the Company's independent auditor by failing to heed the promise to KPMG that Defendant Hewitt "would not reinsert himself into the management of" Liberty, to make and/or cause the Company to make the false and misleading statements and omissions of material fact while three of them engaged in insider sales based on material non-public information, netting proceeds of about $2 million, and, at the same time, to cause the Company to overpay $158,598 for repurchases of its own stock, and to approve the severance payment to Defendant Hewitt consisting of $801,005 in a lump-sum payment, 18 months of health benefits and $471,210 in unvested stock awards that had been accelerated, which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

224.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in or allowed the Sexual and Resource Misconduct and made and/or caused the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors and to put Hewitt's interests before the Company's. While investors were

duped into believing the fraud perpetrated by the Individual Defendants, three of the Individual Defendants, all of whom are Director-Defendants, collectively sold about $2 million worth of Company stock at artificially inflated prices based on inside material information.

225. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

226. Additional reasons that demand on Defendant Hewitt is futile follow. Defendant Hewitt is the Chairman of the Board, a position he has occupied since 1996. Defendant Hewitt served as Liberty's President and CEO from 1996 to September 5, 2017, and is, thus, as the Company admits, a non-independent director. Indeed, the Company compensated him with nearly $1.7 million in the 2016-2017 fiscal year. Defendant Hewitt's large Company stock holding, worth over $31.7 million on July 21, 2017, reveals his interest in keeping the Company's stock price as high as possible. Defendant Hewitt was ultimately responsible for both the Sexual and Resource Misconduct, which he personally perpetrated, and the false and misleading statements and omissions that were made, including those contained in the SEC filings referenced herein, which he signed and personally made. Additionally, he is liable for causing the Company to fail to disclose that: (1) as Liberty's CEO, he created an inappropriate "tone at the top"; (2) he engaged in the Sexual Misconduct; (3) he engaged in the Resource Misconduct; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lack a reasonable basis at all relevant times. His insider sales before the fraud was exposed, which yielded almost $2 million in proceeds, demonstrate his motive in

facilitating and participating in the fraud. Furthermore, Defendant Hewitt is a defendant in the Securities Class Actions. Defendant Hewitt has also demonstrated a firm commitment to entrenching himself at Liberty, retaining control of the board and protecting his position via, *inter alia*, a poison put, demonstrating his inability to consider a litigation demand with disinterest. Thus, for these reasons, too, Defendant Hewitt breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

227.    Additional reasons that demand on Defendant D'Angelo is futile follow. Defendant D'Angelo has served as a director since 2011 and has been Defendant Hewitt's best friend since childhood. Defendant D'Angelo discussed their friendship in his book, *Vision*. Defendant Hewitt also discussed their friendship in his 2016 book, *iCompete: How My Extraordinary Strategy for Winning Can Be Yours* (hereinafter, "*iCompete*"), in which he says that he and Defendant D'Angelo "are still close friends today and I consider Gordon to be one of my most loyal confidants and advisors." In support of *iCompete*, Defendant D'Angelo wrote that: "[t]hough I've had many successes in my life, without a doubt, John has been my number one human resource. . . . One ounce of his commentary can lead to tons of growth." Defendant Hewitt has consistently installed Defendant D'Angelo in every company Defendant Hewitt has worked for. When Defendant Hewitt worked for H&R Block in the 1970's, he recruited Defendant D'Angelo to work there as well. Defendant D'Angelo was on the Board of Jackson Hewitt. In 2015, Defendant Hewitt caused Liberty to retain Defendant D'Angelo as Vice President of Business Development to "assist with both franchise development and marketing" and lead the "Compliance Task Force," and is thus, as the Company admits, a non-independent

director. D'Angelo receives lavish compensation, including $309,00 for his officer position and approximately $110,000 in compensation for his service as a director in the 2016-2017 fiscal year.  He is beholden to Liberty and Defendant Hewitt for his livelihood, and he cannot consider a demand with disinterest or independence.   Defendant D'Angelo's large Company stock holding, worth approximately $459,000 on July 21, 2017, reveals his interest in keeping the Company's stock price as high as possible. Defendant D'Angelo signed, and thus personally made, the false and misleading statements in the 2015-2016 10-K and 2016-2017 10-K. Additionally, he is liable for causing the Company to fail to disclose that: (1) Defendant Hewitt, as Liberty's CEO, created an inappropriate "tone at the top"; (2) Defendant Hewitt engaged in the Sexual Misconduct; (3) Defendant Hewitt engaged in the Resource Misconduct; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lack a reasonable basis at all relevant times. His insider sales before the fraud was exposed, which yielded approximately $20,200 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Finally*, Defendant D'Angelo conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in the Sexual and Resource Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His decision to approve the severance payment to Defendant Hewitt consisting of $801,005 in a lump-sum payment, 18 months of health benefits and $471,210 in unvested stock awards that had been accelerated was not the exercise of legitimate  business judgment and reveals that he is not disinterested in considering a demand.

Thus, for these reasons, too, Defendant D'Angelo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

228.    Additional reasons that demand on Defendant McDowell is futile follow. Defendant McDowell has served as a Company director since 2010. She is also the sister of Defendant Hewitt, and, thus, as the Company admits, a non-independent director. She receives lavish compensation, including nearly $110,000 in the 2016-2017 fiscal year. Defendant McDowell's large Company stock holding, worth approximately $1.2 million on July 21, 2017, reveals her interest in keeping the Company's stock price as high as possible. As a long-time director, Defendant McDowell conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in the Sexual and Resource Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Moreover, she signed, and thus personally made, the false and misleading statements in the 2015-2016 10-K and 2016-2017 10-K that are referenced herein. She is liable for causing the Company to fail to disclose that: (1) Defendant Hewitt, as Liberty's CEO, created an inappropriate "tone at the top"; (2) Defendant Hewitt engaged in the Sexual Misconduct; (3) Defendant Hewitt engaged in the Resource Misconduct; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lack a reasonable basis at all relevant times. Her insider sales before the fraud was exposed, which yielded approximately $122,900 in proceeds, demonstrate her motive in facilitating and participating in the fraud. Her

decision to approve the severance payment to Defendant Hewitt consisting of $801,005 in a lump-sum payment, 18 months of health benefits and $471,210 in unvested stock awards that had been accelerated was not the exercise of legitimate business judgment and reveals that he is not disinterested in considering a demand. Thus, for these reasons, too, Defendant McDowell breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

229.    Additional reasons that demand on Defendant Seal is futile follow. Defendant Seal has served as a Company director since November 2017 and has been working with Hewitt since he joined the tax preparation field. Some 28 years ago, Defendant Seal began as a franchisee at Jackson Hewitt Tax Service, becoming Jackson Hewitt's Director of Field Operations in 1993. Defendant Seal then followed Defendant Hewitt to Liberty, starting as Vice President of Finance in 1997. In that role, Defendant Seal assisted in the purchase of U&R Tax Depot and the development of Liberty Tax Service in the U.S. Beginning in 2000, Defendant Seal became a Liberty franchisee, operating franchises in Virginia and Nevada. In 2012, Seal also became an Area Developer in the southern part of Houston, Texas, and has borrowed large amounts of money from the Company to purchase the territory. Defendant Seal still owes approximately $223,000 on the loan, and franchise fee revenue in his territory was $138,000 for the 2016-2017 fiscal year. Thus, Defendant Seal is not an independent director.  He is beholden to Liberty and Defendant Hewitt for his livelihood, and he cannot consider a demand with disinterest or independence. Further, Defendant Seal and Defendant Hewitt have a very close relationship. In support of Defendant Hewitt's book *iCompete*, Defendant Seal wrote "I learned more from John about business management, people management and human relations than I

ever did in MBA school and in my Fortune 50 corporate career." Defendant Seal is also quoted in the book as asserting "I have always valued John's advice to me – on business and personal matters." According to the Form 8-K filed by the Company on November 5, 2017, Defendant Seal receives the same lavish compensation for his service as Company director as "other non-employee Company directors as described in the Company's 2017 Proxy Statement under 'Non-Employee Director Compensation.'" As a Director, Defendant Seal conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in the Sexual and Resource Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. He is liable for causing the Company to fail to disclose that: (1) Defendant Hewitt, as Liberty's CEO, created an inappropriate "tone at the top"; (2) Defendant Hewitt engaged in the Sexual Misconduct; (3) Defendant Hewitt engaged in the Resource Misconduct; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lack a reasonable basis at all relevant times. His decision to approve the severance payment to Defendant Hewitt consisting of $801,005 in a lump-sum payment, 18 months of health benefits and $471,210 in unvested stock awards that had been accelerated was not the exercise of legitimate  business judgment and reveals that he is not disinterested in considering a demand. Thus, for these reasons, too, Defendant Seal breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

230.    Additional reasons that demand on Defendant Longfield is futile follow. Defendant Longfield has served as a Company director since 2001 and is Chair of the Audit Committee and is the sole member of both the Compensation and the Nominating and Corporate Governance Committees. He was compensated with $124,999 in 2016, and so lacks independence. Defendant Longfield's large Company stock holding, worth approximately $637,432 on July 21, 2017, reveals his interest in keeping the Company's stock price as high as possible. As a director and chair of the Audit Committee during the Relevant Period, Defendant Longfield conducted little, if any, oversight of the Company's internal controls and of the schemes to engage in the Sexual and Resource Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, he signed, and thus personally made, the false and misleading statements in the 2015-2016 10-K and 2016-2017 10-K that are referenced herein. He is liable for causing the Company to fail to disclose that: (1) Defendant Hewitt, as Liberty's CEO, created an inappropriate "tone at the top"; (2) Defendant Hewitt engaged in the Sexual Misconduct; (3) Defendant Hewitt engaged in the Resource Misconduct; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lack a reasonable basis at all relevant times. His decision to approve the severance payment to Defendant Hewitt consisting of $801,005 in a lump-sum payment, 18 months of health benefits and $471,210 in unvested stock awards that had been accelerated was not the exercise of legitimate  business judgment and reveals that he is not disinterested in considering a demand. Thus, for these reasons, too, Defendant Longfield

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

231.    Additional reasons that demand on the Board is futile follow.

232.    Demand is excused as to the Class B Director-Defendants (Defendants D'Angelo, McDowell, Seal, and Hewitt) because, other than Defendant Hewitt himself, all Class B directors are handpicked by Defendant Hewitt, and are beholden to him. Defendant Hewitt has shown a willingness to remove any Class B director who disagrees with him, as demonstrated by his removal of Defendants Herskovits and Howard from the Board. Indeed, several of the resigning Class A directors cited Defendant Hewitt's control of the Class B board members as reason for their departures:

- On November 10, 2017, in connection with Defendant Garel's announcement that he would not stand for reelection: "the removal of Herskovits and Howard . . . allow [Defendant Hewitt] via his Class B rights to, in effect, manage the Company."

- On December 15, 2017, in connection with Defendant Ibbotson's resignation: "Despite my best efforts, I no longer believe that I can have a meaningful influence on the management of the company, and accordingly, I no longer believe that I can be an effective member of the Board of Directors in serving the interests of shareholders."

- On December 18, 2017, in connection with Defendant Garel's resignation: "the Class B Directors are acting in unison through Mr. Hewitt's Class B rights and are . . . unwilling to consider input that interferes with their objectives . . . I am no longer able to exercise my Director responsibilities, and [ ] the combined actions of the Class B directors have put an end to

my tenure as an Independent Director by rendering the remainder of my term as mere form over substance."

233.    As described above, three of the Directors on the Board directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Defendants Hewitt, McDowell and D'Angelo received proceeds of about $2 million as a result of insider transactions executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and excused.

234.    Additionally, each one of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by $158,598 for its own common stock during the period in which the false and misleading statements were made. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

235.    Further, the Company's periodic filings with the SEC during the Relevant Period note that an unnamed member of the Board is affiliated with another company with which Liberty has entered into a multi-year contract to purchase a license to use Canadian tax software. That contract, initially worth approximately $700,000, was renewed in the second quarter of the 2016-2017 fiscal year for approximately $900,000. Therefore, demand is futile as to this director because the director lacks independence as a result of this contract.

236.     Liberty has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Liberty any part of the damages Liberty suffered, and will continue to suffer, thereby. Thus, any demand on the Directors would be futile.

237.     The Individual Defendants' conduct described herein and summarized above, including the decision for the Company to engage in the repurchases of its own stock, could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, such Directors are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

238.     The acts complained of herein constitute violations of fiduciary duties owed by Liberty's officers and directors, and these acts are incapable of ratification.

239.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Liberty. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants,

known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Liberty, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

240.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Liberty to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

241.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least three of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

242.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

243.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

244.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

245.    Under the direction and watch of the Directors, the 2016 and 2017 Proxy Statements failed to disclose that: (1) Defendant Hewitt, as Liberty's CEO, created an inappropriate "tone at the top"; (2) Defendant Hewitt engaged in the Sexual Misconduct; (3) Defendant Hewitt engaged in the Resource Misconduct; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lack a reasonable basis at all relevant times.

246.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2016 and 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2016 and 2017 Proxy Statements, including but not limited to, election of directors and ratification of an independent auditor.

247.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2016 and 2017 Proxy Statements.

248.    Plaintiff, on behalf of Liberty, has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

249.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

250.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Liberty. Not only is Liberty now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Liberty by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase  hundreds of thousands of dollars of its own shares on the open market at artificially-inflated prices, damaging Liberty by over one hundred and fifty thousand dollars.

251.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

252. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Liberty not misleading.

253. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Liberty. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

254. In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director would have signed at least certain of the Company's false and misleading SEC filings, including the Form 10-K's. Indeed, Defendants Hewitt, Donovan, D'Angelo, Garel,

Herskovits, Howard, Ibbotson, Longfield, McDowell, and Robson signed the 2015-2016 10-K and the 2016-2017 10-K.

255.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

256.    Plaintiff, on behalf of Liberty, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

257.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

258.    The Individual Defendants, by virtue of their positions with Liberty and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Liberty and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Liberty to engage in the illegal conduct and practices complained of herein.

259.    Plaintiff, on behalf of Liberty, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

260.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

261.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Liberty's business and affairs.

262.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

263.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Liberty.

264.    In breach of his/their fiduciary duties owed to the Company, Defendant Hewitt engaged in the Sexual and Resource Misconduct, and the Individual Defendants permitted him to do so.

265.    The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

266.    In further breach of their fiduciary duties owed to Liberty, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact. Specifically, Defendants failed to disclose that: (1) Defendant Hewitt, as Liberty's CEO, created an inappropriate "tone at the top"; (2) Defendant Hewitt engaged in the Sexual Misconduct; (3) Defendant Hewitt engaged in the Resource Misconduct; (4) the Company failed to maintain internal controls; and (5) as a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lack a reasonable basis at all relevant times.

267.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

268.    In breach of their fiduciary duties, three of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein. Moreover, while the price of the Company's stock was artificially inflated, the Individual Defendants, in further breach of their fiduciary duties, caused the Company to engage in repurchasing its own stock.

269.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Liberty's securities and disguising insider sales.

270.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the

price of Liberty's securities, engaging in insider sales, and putting Defendant Hewitt's interests before those of the Company.

271.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

272.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Liberty has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

273.    Plaintiff, on behalf of Liberty, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

274.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

275.    By their wrongful acts and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Liberty.

276.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Liberty that was tied to the performance or artificially inflated valuation of Liberty, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

277.    Plaintiff, as a shareholder and a representative of Liberty, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation (including any performance-based or

valuation-based compensation)—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

278.    Plaintiff, on behalf of Liberty, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

279.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

280.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Liberty, for which they are legally responsible.

281.    As a direct and proximate result of the Individual Defendants' abuse of control, Liberty has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Liberty has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

282.    Plaintiff, on behalf of Liberty, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

283.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

284.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties

with regard to prudently managing the assets and business of Liberty in a manner consistent with the operations of a publicly-held corporation.

285.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Liberty has sustained and will continue to sustain significant damages.

286.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

287.    Plaintiff, on behalf of Liberty, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

288.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

289.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Liberty to waste valuable corporate assets in order to benefit Defendant Hewitt personally and to incur many millions of dollars of legal liability and/or costs to defend unlawful actions. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

290.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

291.    Plaintiff, on behalf of Liberty, has no adequate remedy at law.

## <u>PRAYER FOR RELIEF</u>

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all of the Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Liberty, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Liberty;

(c)     Determining and awarding to Liberty the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Liberty and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Liberty and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the Class A shareholders of Liberty to nominate at least five candidates for election to the board;

3. a proposal to ensure the establishment of effective oversight of compliance

- 79 -

with applicable laws, rules, and regulations;

    4.  a proposal to revise the Code of Conduct to include provisions prohibiting sexual harassment and discrimination, and governing the maintenance and disclosure of sexual and romantic relationships between individuals associated with Liberty.

    (e) Awarding Liberty restitution from Individual Defendants, and each of them;

    (f)  Awarding  Plaintiff  the  costs  and  disbursements  of  this  action,  including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g) Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

    Plaintiff hereby demands a trial by jury.


Dated: March 6, 2018                Respectfully submitted,

Of Counsel:                   **BENNETT AND SHARP, PLLC**

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim                           _____/s/ Carlton F. Bennett_____.
275 Madison Avenue, 34th Floor       Carlton F. Bennett (VSB #18453)
New York, NY 10016                120 South Lynnhaven Road, Suite 100
Telephone: (212) 686-1060           Virginia Beach, VA 23452
Facsimile: (212) 202-3827            Telephone: (757) 486-5454
Email: pkim@rosenlegal.com          Facsimile: (757) 486-8910
                                     Email: cbennett@bandslawyers.com
**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown                 Attorneys for Plaintiff
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net